# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

| | |
|---|---|
| **JAN WRIGHT** | **CASE NO.  6:24-CV-01760** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION** | **MAGISTRATE JUDGE CAROL B. WHITEHURST** |

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, it is recommended that the Commissioner's decision be reversed and remanded for further administrative action.

## Administrative Proceedings

Claimant, Jan Wright, fully exhausted her administrative remedies before filing this action in federal court. She filed an application for disability insurance benefits and an application for supplemental security income alleging disability beginning on April 29, 2021. (Rec. Doc. 6-5, p. 204; 213). Her applications were denied. She then requested a hearing, which was held on February 8, 2024, before Administrative Law Judge Carolyn Smilie. The ALJ issued a decision on April 8, 2024, concluding that Claimant was not disabled within the meaning of the Social Security Act from the claimed disability onset date through the date of the decision.

(Rec. Doc. 6-1, p. 24-34). Claimant requested that the Appeals Council review the ALJ's decision, but the Appeals Council found no basis for review. (Rec. Doc. 6-1, p. 7). Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of judicial review. *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005). Claimant then initiated this action, seeking review of the Commissioner's decision.

## Summary of Pertinent Facts

Claimant was born on April 13, 1974. She was 47 years old on the alleged disability onset date and 49 years old at the time of the ALJ's decision. She has a high school education. (Rec. Doc. 6-1, p. 44). She was self-employed from 2013 to 2018 and barely earned above the relevant amount for consideration. (Id., p. 46).

Claimant alleges that she has been disabled since April 29, 2021, when she suffered an aneurism while working in her garden and had to get a shunt. She testified at the hearing that since then, she has suffered from seizures. (Id., 47-48). After having a seizure, it takes her several days to recover, because "everything hurts." She is nauseated and off-balance and has gained weight from being unable to move around. (Id., 48-49). She has been on seizure medication but has suffered break-through seizures and continues to suffer with migraine headaches and sensitivity to smells and light. (Id., 49-51). She no longer drives due to shaking and fear of having another seizure. (Id., 51). Since her aneurism, she has become

2

depressed and unable to do the things she used to, such as painting, redoing furniture, arts and crafts, gardening, and even drinking coffee due to her mental state following the bleed. (Id., 53-54). She has trouble holding things and gets numb. (Id., 54-55). Her speech is slowed as well, a fact the ALJ recognized on the record. (Id., 59-60). She lives with her parents due to her medical condition and loss of memory following the aneurism. Her mother sleeps with her to watch out for her. (Id., 56-57).

The ALJ reviewed the following records in rendering the decision to deny benefits:

- Claimant presented by ambulance to the Ochsner Acadia General Hospital on April 29, 2021 with acute global subarachnoid hemorrhage with associated small volume intraventricular blood. She was airlifted to Tulane. (Rec. Doc. 6-5, p. 380-91). She was admitted to Tulane Hospital on April 30, 2021 with ruptured aneurism and was eventually discharged on May 21, 2021. She required VP shunt placement and EVD removal on May 19, 2021 for continued obstructive hydrocephalus. She exhibited continued neuro deficits with EVD clamping, mild to severe vasospasms, and seizures during her stay. (Id. at 402-52).

- She followed up with Dr. Mark Dawson in June and July 2021 after discharge. Her course had been stable and nonprogressive and of severe intensity. She had occasional dizziness and lightheadedness, and her head was very sensitive. She had time lapses as well as staring off into space. She was also having hip pain. (Id. at 455-60).

- She presented to the emergency room on September 29, 2021 with headache and seizures, five months after her aneurism. A CT of her head revealed no acute intracranial abnormality, with interval decrease in size of the lateral ventricles with ventricular shunt catheter in place. (Id. at 544-51). Thereafter, she followed up with Dr. Dawson for epilepsy and migraine. She reported having had two seizures, with shaking shoulders

and drooling. Symptoms associated with her headaches included confusion, nausea, phonophobia, photophobia, and vomiting. She also had continued left hip pain. (Id., p. 584-86; 615).

- An October 2021 MRA of her head showed coil embolization at the right P-comm aneurysm without residual/recurrent aneurysm and no new cerebral artery aneurysm. (Id., p. 884)

- She presented to the emergency room in July 2022 with increased seizures, headache, and dizziness. She appeared to have an unsteady gait upon admit and reported dizziness and blurred vision. She was diagnosed with CVA, increased intracranial pressure, anemia, and vertigo. She was discharged home with a normal gait. (Id., p. 764-770). A July 2022 CT of her head showed almost complete resolution of the global subarachnoid hemorrhage with trace residual in the temporal horn of the right lateral ventricle and no acute intracranial process identified. (Id., p. 635-36).

- Claimant treated with neurologist, Dr. Arthur Wang immediately following her aneurism. In her June 15, 2021 follow-up, Dr. Wang noted she had suffered a ruptured left posterior communicating artery aneurysm and ventriculoperitoneal shunt but was doing well. (Rec. Doc. 6-5, p. 695-96). By the next follow up in October 2021 she complained of postural headaches, hip pain, and intermittent shaking of her body without loss of consciousness. Dr. Wang adjusted her shunt setting to help with headaches. (Id., 693-94). At her one-year follow up, Dr. Wang noted she had no recurrence of aneurism and was doing well. (Id., 683-84).

- Claimant has also treated with neurologist, Dr. Jessica Kraker, who saw her outpatient in January 2022. At the first visit, Claimant reported that she cannot get up fast, she gets dizzy and nauseated and was having headaches. She was having seizures that caused a funny taste in her mouth and her stare will be stuck in one spot. Her arm starts shaking and she feels the need to lay down. Dr. Kraker noted that before the aneurism, she was a heavy smoker and took an enormous amount of BC powder all the time due to headaches. After the aneurism, she felt like a clamp was on the side of her head. She got nauseated and had to lay down and wanted to be by herself. Dr. Kraker prescribed seizure medication, among others for nausea and migraines. (Rec. Doc. 6-5, p. 689-92).

4

- A February 2022 EEG showed no epileptiform discharges, with no clinical or electrographic seizures during the recording. Photic stimulation produced no abnormality. (p. 703-04).

- At her April 2022 follow up with Dr. Kraker, Claimant was still having shakes, especially if she was out. If she got nervous, her left hand and left leg would shake. She continued with jerks and staring spells. Dr. Kraker adjusted medications. (Rec. Doc. 6-5, p. 686-88). In May 2022, she complained of a four-day long migraine headaches with nausea, fever and swollen lymph nodes. Dr. Kraker prescribed several medications for migraine with aura. The headaches were improved but continued a week later and she was still shaking. (Id. at 676-81).

- A May 2022 MRI of her brain and MRA of her head showed coil embolization at the right P-comm aneurysm without residual/recurrences or new aneurysm, ventricular shunt without hydrocephalus, and 1 cm left parietal lob high T2 signal lesion without mass effect, likely secondary to cerebral ischemia. (Id., p. 698).

- According to the October 2022 follow up notes with Dr. Kraker, Claimant had been diagnosed with lupus. She reported that her seizures were out of control, occurring at least three times a week at night and during the day. She would wake up with stomach and tongue bites, she gets a weird feeling on her tongue and gets confused. She continued with left sided head pain and nausea that required nausea medicine all the time and most of her time being spend on the sofa. Dr. Kraker wanted to bring in EMU to capture and quantify shaking spells. (Id., p. 672-75).

- A November 2022 MRA of her head showed status post right posterior communicating artery aneurysm coiling, but was otherwise normal. (Rec. Doc. 6-5, p. 697).

- On February 27, 2023, she was admitted to the EMU for spell characterization of nocturnal shaking and was discharged on March 3, 2023. During the admission, the EEG remained normal even with sleep deprivation, photic stimulation, and hyperventilation. She was nevertheless discharged on increased VPA dose due to consistent reported semiology and low serum VPA trough. The admit notes indicate that she had good control of seizures with VPA, but it had become less effective.

She noted nocturnal shaking 2-3 times per week as noted by family. She had an episode of prolonged intermittent shaking a few weeks prior requiring an ER visit. She noted emotional/mental fatigue and that flashing lights triggered episodes. Her family reported her head turning to unknown side, high frequency, low amplitude shaking with post episodic confusion. She reported tongue biting before and tongue numbness at times, a tremor worse in her right arm and recent lupus diagnosis with rash and arthritis, but she had not been on medication for it. (Id., p. 856-65).

- An August 2023 CT of her brain showed VP shunt in unchanged position with interval decrease in size of ventricles, with a note to correlate for symptoms of over shunting. (Id., p. 852). An October 2023 MRA of her head showed unchanged posterior communicating artery aneurysm coils and left frontal approach ventriculostomy catheter with no new or recurrent aneurysm. (Id., p. 847).

Claimant presented the following medical records as new and material evidence to the Appeals Council for review:

- Claimant underwent in-patient rehab at Tulane Lakeside following her aneurism from May 21 to 31, 2021. (Rec. Doc. 6-1, p. 108; Rec. Doc. 6-2; Rec. Doc. 6-3). Following discharge, she continued with out-patient physical and occupational therapy through July 2021. She had a noted limited right visual field and impaired performance components such as strength and balance, which had a direct effect on her functional skills. She had headaches, dizziness/spinning, and decreased functional ability. She cancelled several appointments due to not feeling well, but she was a motivated participant otherwise. (Rec. Doc. 6-4, p. 75-90).

- In August 2023, Claimant returned to Dr. Wang with occipital headaches. She had been referred for shunt evaluation. Evaluation of CT findings showed stability of the ventricular system and shunt tubing patency. Dr. Wang concluded no further intervention was needed for the shunt. (Rec. Doc. 6-4, 110-11). A progress note from Dr. Wang in May 2024 indicates that she was having positional headaches consistent with shunt over drainage. (Id., 113).

- Claimant has also treated with neurologist, Dr. Jessica Kraker, who began seeing her in January 2022. At the first visit, Claimant reported that she cannot get up fast, she gets dizzy and nauseated and was having headaches. She was

6

having seizures that caused a funny taste in her mouth and her stare will be stuck in one spot. Her arm starts shaking and she feels the need to lay down. Dr. Kraker noted that before the aneurism, she was a heavy smoker and took an enormous amount of BC powder all the time due to headaches. After the aneurism, she felt like a clamp was on the side of her head. She got nauseated and had to lay down and wanted to be by herself. Dr. Kraker prescribed seizure medication, among others for nausea and migraines. (Rec. Doc. 6-4, p. 119-21).

- At her April 2022 follow up with Dr. Kraker, Claimant was still having shakes, especially if she was out. If she got nervous, her left hand and left leg would shake. She continued with jerks and staring spells. Dr. Kraker adjusted medications. (Rec. Doc. 6-4, p. 123-25). She later suffered a four-day long migraine headache with nausea, fever and swollen lymph nodes. Dr. Kraker prescribed several medications for migraine with aura. The headaches were improved but continued a week later and she was still shaking. (Id. at 126-29).

- By the January 2023 visit to Dr. Kraker, Claimant had moved in with her parents due to her medical issues and had not yet made it to the EMU. (Rec. Doc. 6-5, p. 5). Six months later, in July 2023, Claimant presented for the first time for Botox for chronic migraines. She was very depressed but denied suicidal ideation. She was on two medications for depression but would benefit from psychiatric help. She had been in EMU in March 2023, but no events were captured, and her EEG was normal. Her VPA was increased, and she reported ongoing seizures. She felt her gait had been off and wanted to have her shunt checked. She was referred to Dr. Wang for a shunt evaluation and to psychiatry for anxiety and depression. (Id., p. 9-13). Thereafter, she continued with Botox injections every twelve weeks. By November 2023, she noticed decreased migraines (as few as three times a week) until Botox wore off. She had some staring spells but noted she had no further shaking spells after increasing her VPA. She did have tremors in her right hand that got worse with anxiety. (Id., p. 15-18).

- In February 2024, when Claimant returned for her next Botox injection, she reported to Dr. Kraker that when Botox wore off, she had daily migraines mainly on the left side, with frequent nausea, photo phobia, phonophobia, and ringing in her ears. She had been unable to find mental health help due to her insurance, but she seemed to be in better spirits. She was seeing a rheumatologist for lupus. She had experienced three convulsion events in

January 2024 and one in early February for which she had called 911. (Rec. Doc. 6-5, p. 20-24).

- She had another Botox injection for migraines in May 2024. She had suffered two seizures in the last few months. She noted that Botox was really helping, but she had ongoing tremors during times of stress or anxiety. She was getting her shunt adjusted due to getting headaches when she stood up. Dr. Kraker updated her medications. Botox was indicated for her due to chronic migraines more than fifteen days a month lasting more than four hours a day with no relief from symptoms despite multiple medications. The list of her medical issues is extensive and significant. (Rec. Doc. 6-5, p. 25-38).

- On May 24, 2024, Dr. Kraker completed a physical disability form for aneurism with shunt, seizures, migraines and tremors since April 29, 2021. She indicated Claimant had disorganization of motor function in two extremities, resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking or use the upper extremities, with personality changes, long term memory loss, and seizures. She had marked impairments in all physical and mental functions; she was limited to sitting or standing for thirty minutes at a time with no lifting. She could only work for two hours per day. Her right arm tremor limited her ability for physical job duties. (Rec. Doc. 6-5, p. 43-44). Dr. Kraker's evaluation mirrored Dr. Wang's earlier evaluation of April 9, 2021, except that Dr. Wang had noted then that Claimant had persisting sensory or motor aphasia resulting in ineffective speech or communication. (Id. at 45-46). Dr. Mark Dawson's February 2, 2024 form stated that Claimant could stand or sit for fifteen minutes, but she could not work for any amount of time. (Rec. Doc. 6-6, p. 139).

- Claimant's primary doctor is Dr. Mark Dawson. He has treated her for hypertension, epilepsy, an ongoing skin rash (actinic keratosis), and depression among numerous other conditions since March 2022. (6-6, p. 142-85; Rec. Doc. 6-4, p. 91-103). Otherwise, the records are replete with evidence of ongoing seizures (e.g. Rec. Doc. 6-6, p. 213; 258) and at least one instance of a transient ischemic attack (p. 257).

The Court finds that Claimant's extensive medical records substantially corroborate her testimony. Nevertheless, the ALJ determined that Claimant is

capable of performing light duty work, subject to certain restrictions, and that sufficient qualifying jobs exist such that she is not disabled. (Rec. Doc. 6-1, p. 24-34). Claimant now seeks reversal of the Commissioner's adverse ruling.

## Analysis

### A.    Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence. *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983). Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Id.* (citations omitted).

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173. A court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.

*Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022. Conflicts in the evidence and credibility assessments are for the Commissioner to resolve, not the courts. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991). Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience. *Wren v. Sullivan*, 925 F.2d at 126.

**B.    Entitlement to Benefits**

The Disability Insurance Benefit program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. See 42 U.S.C. § 423(a).  See also *Smith v. Berryhill*, 139 S.Ct. 1865, 1772 (2019). Supplemental Security Income SSI provides income to individuals who meet certain income and resource requirements, have applied for benefits, and are disabled. 42 U.S.C. § 1382(a)(1) & (2).  See also *Smith v. Berryhill*, 139 S.Ct. at 1772. A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42

U.S.C. § 1382c(a)(3)(A). A claimant is disabled if his physical or mental impairment or impairments are so severe that he is unable do his previous work and considering his age, education, and work experience, cannot participate in any other kind of substantial gainful work that exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work. 42 U.S.C. § 1382c(a)(3)(B).

**C.    <u>Evaluation Process and Burden of Proof</u>**

A sequential five-step inquiry is used to determine whether a claimant is disabled.  The Commissioner must determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work. 20 C.F.R. § 404.1520.

Before going from step three to step four, the Commissioner evaluates the claimant's residual functional capacity by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record. 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 404.1545(a)(1). The claimant's residual functional capacity is used at the fourth step to determine if he can still do

his past relevant work and at the fifth step to determine whether he can adjust to any other type of work. 20 C.F.R. § 404.1520(e).

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy. *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994). This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302. If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

## D.    **The ALJ's Findings and Conclusions**

The ALJ determined at step one that Claimant has not engaged in substantial gainful activity since April 29, 2021. (Rec. Doc. 6-1, p. 27). This finding is supported by substantial evidence in the record.

12

At step two, the ALJ found that Claimant has the following severe impairments: subarachnoid hemorrhage resulting from ruptured cerebral aneurysm, residual effects of shunt placement and artery coiling, headache disorder, degenerative disc disease and obesity. (Id.). This finding is supported by substantial evidence in the record.

At step three, the ALJ found that Claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment. (Id. at p. 28-29). Claimant did not explicitly challenge this finding as an assignment of error; however, she asserts in briefing that the ALJ should have found she met listing 11.04 for vascular insult to brain.

The ALJ found that Claimant has the residual functional capacity to perform light duty work, subject to restrictions for climbing, working around hazards, noise, vibrations, and temperature extremes.  Claimant challenges this finding.

At step four, the ALJ found Claimant has no past relevant work. Claimant does not challenge this finding.

At step five, the ALJ found Claimant is not disabled in that a significant number of qualifying jobs, including price marker, router, and silver wrapper, exist within the national economy. Claimant challenges this finding.

### E.    The Allegations of Error

Claimant alleges the Appeals Council erred in not considering new and material evidence. She further alleges the ALJ erred by 1) using a lower age category and failing to consider her borderline age as closely approaching advanced age; 2) assessing a light RFC with the ability to perform work on a regular and continuing basis; and 3) failing to include any restrictions for fingering and handling, because she is right-hand dominant and suffers right arm and hand tremors, and the available jobs considered require fingering and handling. Although Claimant did not specifically assert as an error that the ALJ failed to find she qualified for a listing, she argues in briefing that the ALJ should have found her condition satisfies the listing for 11.04.

### F.    Whether the Appeals Council erred in not considering new and material evidence.

Following the hearing, Claimant submitted new and updated records from Dr. Wang, Dr. Kraker, Tulane Lakeside Rehab Hospital, and Tulane Medical Center, outlined above, to the Appeals Council. Claimants are free to submit new evidence to the Appeals Council. 20 C.F.R. § 404.968(a). Such evidence is considered part of the record upon which the Commissioner's final decision is based. *Higginbotham v. Barnhard*, 405 F.3d 332, 337 (5th Cir. 2005).   The district court must examine all of the evidence, including the new evidence, to determine whether the Commissioner's final decision to deny a claim is supported by substantial evidence. *Sun v. Colvin*,

14

793 F.3d 502, 510 (5th Cir. 2015). Newly submitted evidence is material if (1) it relates to the time period for which the disability benefits were denied; and (2) there is a reasonable probability that it would have changed the outcome of the disability determination. *Castillo v. Barnhart*, 325 F.3d 550, 551-52 (5th Cir. 2003) (per curiam); 20 C.F.R. § 404.970(a)(5). "Implicit in the materiality requirement ... 'is that the new evidence relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition.'" *Hunter v. Astrue*, 283 F. App'x 261, 262 (5th Cir. 2008). When the new evidence does not relate to the contested time period or concerns a subsequently acquired disability, the proper action is to file a new application for disability benefits based on the new condition. *Id*.

The Appeals Council found records from Dr. Kraker and Dr. Dawson from May 24, 2024 and May 16, 2024, respectively, did not relate to the time period at issue, since the ALJ decided the case on April 8, 2024. (Rec. Doc. 6-1, p. 8). This holding is reversible error. The determinative inquiry is whether the new evidence relates to the condition(s) for which the claimant sought benefits. Whether the new evidence occurred after the ALJ's decision is irrelevant. *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995) (holding that new evidence from the claimant's back surgery, which occurred after the ALJ's decision, was new and material).

15

The Appeals Council also found no reasonable probability that the new records would change the outcome of the ALJ's decision. Again, the Court disagrees. The ALJ did not consider records pertaining to Claimant's most recent treatment with Dr. Wang and Dr. Kraker. These records, outlined above, show that Claimant continues to suffer from ongoing seizures and debilitating headaches, though she had found some relief with Botox, as well as worsening depression. As evidence of Claimant's unresolved issues, these records could have changed the outcome of the ALJ's determination. Most importantly, the ALJ was without disability forms completed by Dr. Kraker on May 24, 2024 and by Dr. Dawson on February 2, 2024. These forms alone are evidence which could have changed the outcome of the disability determination. The Appeals Council erred in failing to consider all new evidence.

Having found that the case should be remanded for consideration of the newly submitted records, the Court provides the following additional instructions for the ALJ on remand.

## G.     Consideration of Listing 11.04.

An "ALJ is required to discuss the evidence and explain the basis for his findings at each unfavorable step of the sequential evaluation process." *Williams v. Astrue*, No. 09-0130, 2010 WL 989216, at * 3 (W.D. La. Mar. 15, 2010), citing *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007), which in turn cites 42 U.S.C. §

16

405(b)(1).  More particularly, "[t]he ALJ should identify the listed impairment for which the claimant's symptoms fail to qualify and provide an explanation as to how he or she determined that the symptoms are insufficiently severe to meet any listed impairment." *Savoie v. Colvin*, No. 14-30-JJB-RLB, 2015 WL 1004217, at *5 (M.D. La. Mar. 5, 2015).

In *Audler v. Astrue*, the ALJ, at step three of the analysis, summarily concluded that the medical evidence in the record indicated that the claimant had impairments that were severe but not severe enough to meet or medically equal a listed impairment.  The Fifth Circuit Court of Appeals noted that "[t]he ALJ did not identify the listed impairment for which Audler's symptoms fail to qualify, nor did she provide any explanation as to how she reached the conclusion that Audler's symptoms are insufficiently severe to meet any listed impairment." *Audler v. Astrue*, 501 F.3d at 448. The Fifth Circuit concluded that "[s]uch a bare conclusion is beyond meaningful judicial review." *Id*. quoting *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). The court then went on to explain that:

> By the explicit terms of the statute [42 U.S.C. § 405(b)(1)], the ALJ was required to discuss the evidence offered in support of Audler's claim for disability and to explain why she found Audler not to be disabled at that step.  Although the ALJ is not always required to do an exhaustive point-by-point discussion, in this case, the ALJ offered nothing to support her conclusion at this step and because she did not, "we, as a reviewing court, simply cannot tell whether her decision is based on substantial evidence or not."

17

*Audler v. Astrue*, 501 F.3d at 448, quoting *Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986).

In this case, the ALJ stated that she considered Section 11.04 (among others); however, the decision offers no meaningful analysis. On remand, the ALJ should specifically consider Listing 11.04, vascular insult to the brain:

A. Sensory or motor aphasia resulting in ineffective speech or communication persisting for at least 3 consecutive months after the insult; or

B. Disorganization of motor function in two extremities, resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities, persisting for at least 3 consecutive months after the insult; or

C. Marked limitation in physical functioning and in one of the following areas of mental functioning, both persisting for at least 3 consecutive months after the insult:

   1. Understanding, remembering, or applying information; or
   2. Interacting with others; or
   3. Concentrating, persisting, or maintaining pace; or
   4. Adapting or managing oneself.

20 C.F.R. § Pt. 404, Subpt. P, App. 1

Dr. Wang's April 9, 2021 disability form specifically provided that Claimant suffered from sensory or motor aphasia resulting in ineffective speech or communication persisting for at least three consecutive months, personality changes, memory loss and seizures. (Rec. Doc. 6-5, p. 45). Similarly, Dr. Kraker's May 24, 2024 disability form specifically provided that Claimant suffered disorganization of

18

motor function in two extremities, resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities, persisting for a least three consecutive month, personality changes, long term memory loss, and seizures.(Rec. Doc. 6-5, p. 43). On remand, the ALJ shall consider the foregoing neurosurgeons' statements of Claimant's condition in reference to Listing 11.04.

Finally, on remand, the ALJ shall consider this Court's finding that Claimant's statements concerning the intensity, persistence, and limiting effects of her symptoms are entirely consistent with the medical evidence. The records show that Claimant has continued to suffer from the residual effects of her April 2021 aneurism in the form of seizures, migraines, and tremors, which appear to have had a significant effect on her ability to perform work on a regular and continuing basis. See *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001).

### Conclusion and Recommendation

For the foregoing reasons, this Court recommends that the Commissioner's decision be REVERSED and REMANDED to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) with instructions to consider all new evidence, to evaluate whether Claimant meets the requirements of Listing 11.04, and, if necessary, to re-evaluate Claimant's residual functional capacity and whether she is capable of performing work on a regular and continuing basis. Inasmuch as the

reversal and remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act ("EAJA").[1]

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[2]

---

[1]    See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

[2]    See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).

Signed in Lafayette, Louisiana, this 27th day of August, 2025.

_____
CAROL B. WHITEHURST
UNITED STATES MAGISTRATE JUDGE